Chief Judge Brian A. Tsuchida

# UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF WASHINGTON
### AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA, | NO. CR18-249BAT |
| Plaintiff | **MEMORANDUM IN SUPPORT OF** |
| | **MOTION TO DETAIN DEFENDANT** |
| v. | |
| RON ROCKWELL HANSEN, | |
| Defendant. | |

COMES NOW, the United States of America, by and through the undersigned Assistant United States Attorney, and hereby files the instant memorandum in support of its motion for pretrial detention of the defendant.

## **LEGAL STANDARD**

Pursuant to 18 U.S.C. §3142(f)(1)(B), a crime that carries a maximum penalty of life imprisonment implicates a mandatory detention hearing.  Similarly, certain other circumstances also require a detention hearing, such as when a serious risk exists that the defendant will flee or when a serious risk exists that the defendant will obstruct justice or threaten, injure, or intimidate a prospective witness. 18 U.S.C. §3142(f)(2)(A) and (B).

When a case involves such circumstances, the Bail Reform Act of 1984 provides that "a judicial officer shall hold a hearing to determine whether any condition or

MEMORANDUM IN SUPPORT OF DETENTION- 1

1   combination of conditions … will reasonably assure the appearance of the person as

2   required and the safety of any other person and the community." 18 U.S.C. § 3142(f).  If

3   after a hearing, the Court "finds that no conditions will reasonably assure the appearance

4   of the person as required and the safety of any other person and the community, such

5   judicial officer shall order the detention of the person before trial." 18 U.S.C. §

6   3142(e)(1).

7        In determining whether there are no conditions that will reasonably assure the

8   defendant's appearance, the judicial officer shall "take into account the available

9   information concerning (1) the nature and circumstance of the offense charged…; (2) the

10  weight of the evidence against the person; (3) the history and characteristics of the

11  person…; and (4) the nature and seriousness of the danger to any person or the

12  community that would be posed by the person's release…." 18 U.S.C. § 3142(g).

13       The government must prove a serious risk of flight by "a preponderance of the

14  evidence." *United States v. Cisneros*, 328 F.3d 610, 613 (10th Cir. 2003) (sustaining the

15  district court's determination that "the government had proved by a preponderance of the

16  evidence that Cisneros posed a serious risk of flight such that no conditions of release

17  would reasonably assure Cisnero's presence at trial.").  However, a burden of clear and

18  convincing evidence applies if the government seeks to detain a defendant based upon

19  danger to any other person or the community. 18 U.S.C. § 3142(f)(2).  In the context of a

20  pretrial detention hearing determination, "Congress intended that the concern about

21  safety be given a broader construction than merely danger of harm involving physical

22  violence." *United States v. Acevedo-Ramos,* 600 F. Supp. 501 (D.C. Puerto Rico 1984);

23  *affirmed* 755 F.2d 203 (1st Cir. 1985).

24       "The rules concerning admissibility of evidence in criminal trials do not apply to

25  the presentation and consideration of information at the detention hearing." 18 U.S.C. §

26  3142(f)(2).  Consequently, the government may proceed by proffer. *United States v.*

27  *Smith*, 79 F.3d 1208, 1210 (D. C. Cir 1996) ("Every circuit to have considered the matter

28  … [has] permitted the Government to proceed by way of proffer.").  Therefore, by way of

1  proffer, the United States alleges the following facts as relevant to the court's

2  determination of detention:

### FACTUAL BACKGROUND

4      For many years, the defendant worked in the United States Intelligence

5  Community as a soldier in the United States Army and as a civilian case officer.  In that

6  capacity, the defendant received specialized training in managing assets, deterring

7  surveillance, avoiding detection, and handling classified information.  Following his

8  government service, the defendant worked in China in the computer forensics industry.

9  The defendant speaks fluent Mandarin-Chinese and Russian.

10      In 2014, the Federal Bureau of Investigation (FBI) commenced an investigation

11  into the activities of the defendant.  That investigation revealed that, since at least 2013,

12  the defendant worked closely with intelligence services of the People's Republic of China

13  (PRCIS) and acted in the United States as an agent of the Chinese government.  The

14  defendant attended conferences in the United States on behalf of the PRCIS related to

15  intelligence, national security, and the U.S. military.

16      The investigation further revealed that, while in China, the PRCIS paid the

17  defendant at least $800,000 in cash and that the defendant engaged in sophisticated

18  money laundering activities in an attempt to repatriate those funds back to the United

19  States, while concealing the existence and source of the money.  In that regard, the

20  defendant engaged in bulk cash smuggling, the structuring of monetary transactions,

21  using surrogates to wire funds, and transmitting funds through fictitious credit card

22  transactions.  The defendant also smuggled export-controlled goods from the United

23  States to China, including software with cryptoanalytic capabilities.

24      In 2016, the FBI enlisted the participation of a confidential human source (CHS)

25  to assist in the investigation.  At the direction of the FBI, the CHS met with and spoke to

26  the defendant on the telephone on multiple occasions.  The FBI recorded each of those

27  conversations.  Recent recorded meetings revealed that the defendant attempted to recruit

28  the CHS to assist him in committing espionage on behalf of the PRCIS.  Specifically, the

1   defendant offered to facilitate the sale of national defense information to the PRCIS for

2   their financial benefit.  The defendant advised what information the PRCIS would find

3   useful and how the CHS could record and transmit that information without detection.

4   The defendant also explained to the CHS how they could conceal their meetings and use

5   encrypted communications.  The defendant advised the CHS regarding the probable value

6   of certain items of classified information, potentially obtainable by the CHS, that the

7   defendant could broker to the PRCIS, and the defendant offered to help the CHS launder

8   the proceeds from selling that information.

9          In subsequent conversations, the defendant indicated that he planned to travel to

10  China on June 2, 2018.  The defendant and the CHS agreed to meet near the Seattle-

11  Tacoma airport in Seattle, Washington during a layover of the defendant's flight to

12  China, in order to further their plans.  As part of the operation, the FBI obtained from the

13  United States Army certain  documents, classified as SECRET, regarding the national

14  defense of the United States.  The documents contained visible and distinctive

15  classification markings.  The Army agreed that, as part of the operation, the CHS could

16  provide the classified documents to the defendant long enough to demonstrate the

17  defendant's intention to receive the material and provide it to the PRCIS.

18         On June 2, 2018, during the defendant's layover, the CHS gave the SECRET

19  documents to the defendant.  The defendant reviewed the material, asked detailed

20  questions about it, and took hand-written notes.  When the defendant departed the CHS's

21  car and proceeded toward the airport terminal, surveilling FBI agents immediately

22  arrested the defendant.  Later that evening, Chief Magistrate Judge Paul Warner of the

23  District of Utah authorized the filing of a complaint against the defendant, charging him

24  with attempted delivery of defense information to a foreign government, 18 U.S.C. §

25  794(a), along with other offenses.  That charge carries a maximum possible penalty of

26  life imprisonment.  *Id.*  The transmission or attempted transmission of SECRET

27  information corresponds to a sentencing guideline range of 210-262 months.  U.S.S.G. §

28

2M3.1(a)(2).  The complaint, which the United States incorporates herein by reference, contains a more detailed recitation of the facts developed by the investigation.

## RISK OF FLIGHT

The defendant's history and characteristics, coupled with the penalties associated with the criminal charges that the defendant faces, among other factors, create an overwhelming risk that the defendant will flee to China to avoid prosecution.  The defendant's training as an intelligence case officer, his extensive prior contacts with the PRCIS, and his recent attempt to commit espionage demonstrate why he would seek to flee—and equally importantly, his ability to successfully do so.  Indeed, as detailed below, the defendant contemplated fleeing to China even before he faced spending the rest of his life imprisoned.  In support of the United States' position that the defendant constitutes a flight risk, the United States proffers the following additional facts:

While working as an intelligence case officer the defendant obtained undercover identities, including government issued social security numbers and birth certificates. Because of his failing business ventures and mounting personal debt, the defendant and his wife created a plan to flee to China to avoid financial responsibility.  Similarly, while discussing with the CHS his plan to facilitate the sale of national defense information to the PRCIS, the defendant revealed his plan to flee to China if things went wrong.

As evidence in support of those factual assertions, the United States offers the following Exhibits:[1]

- **Exhibit No. 1**:  On July 28, 2016, during a telephone call with his business partner, the defendant joked about faking his own death and going to "hide in China," if their business venture failed.
- **Exhibit No. 2**:  On July 29, 2016, during a follow-up call to the conversation described in Exhibit 1, the defendant joked further with the same business partner

---

[1] The telephone calls described herein were recorded with court authorization.

MEMORANDUM IN SUPPORT OF DETENTION- 5

1    about faking their own deaths, hiking into Canada, and using false papers to "go teach

2    English in China."[2]

3  • **Exhibit No. 3**:  On September 14, 2016, during a telephone call with his wife, the

4    defendant discussed how his children would divide his $2,000,000 life insurance

5    policy upon his death.

6  • **Exhibit No. 4**:  On January 17, 2017, during a telephone call, the defendant discussed

7    his financial misfortunes with a business associate.  During the call, the defendant

8    stated, "There's a lot of days I wake up and I just feel like getting in the car and

9    driving to another state and you know, looking up one of my aliases I used when I

10   was in military intelligence and creating a new persona and never looking back."

11 • **Exhibit No. 5**:  On January 27, 2017, during a telephone call with other business

12   associates, the defendant again joked about using a fake persona to "disappear off the

13   grid" in order to avoid the consequences of his failing business.  In that call the

14   defendant stated, "Otherwise I'm going to go back and get one of my fake personas

15   that I still have all of the social security numbers for and stuff like that when I was in

16   the intelligence world, and I'm gonna disappear and you guys are never gonna find

17   me again."

18 • **Exhibit No. 6**:  In a later call on January 27, 2017, the defendant made similar

19   comments to a different business associate about what he would do if the business did

20   not improve.  The defendant stated, "I have to go back and get one of my fake

21   personas I used in the intelligence world and you guys will never see me again…

22   They're all valid social security numbers … created by the U.S. government—no  one

23   will ever challenge them—tied to those names, with birth certificates that match my

24   age.  I could very easily take up one of those personas and no one—not even the

25   IRS—would challenge it as a legitimate persona."   The defendant explained that

26   because he possessed government-issued documents he would not have to buy fake

27

28

_____

[2] Prior to joining the U.S. Army, the defendant lived in Taiwan for two years teaching English.

MEMORANDUM IN SUPPORT OF DETENTION- 6

1   ones elsewhere.  The defendant further stated, "I do have my escape route charted out,

2   just so you know."

3   • **Exhibit No. 7**:  During a call on June 5, 2017, while expressing his exasperation to a

4   colleague about his failing business, the defendant again stated, "Maybe I will just

5   book myself a trip to China and disappear."

6   • **Exhibit No. 8**:  During a call on June 5, 2017, the defendant stated that mental stress

7   is going to push him over the edge, and he made another reference to killing himself

8   by jumping off a bridge.

9   • **Exhibit No. 9**:  In a recorded conversation with the CHS on April 5, 2018, the

10  defendant stated, "If we do this and something happens . . . you go into Canada and

11  get on a plane and come here to China, then you're taken care of [for the rest of your

12  life.]"  The defendant then reassured the CHS the MSS would take care of him.

13  • **Exhibit No. 10**:  In a recorded conversation with the CHS on April 10, 2018, while

14  planning their efforts to sell national defense information to the PRCIS, the defendant

15  stated, "having worked very closely with the MSS, the MPS, and the BSSB, the

16  Beijing State Security Bureau. They'll kill you, you know, if you fuck them over.

17  They are not above sending someone here to hunt you down and kill you."

18  • **Exhibit No. 11**:  On May 1, 2018, during a telephone call in which the defendant

19  discussed his financial problems with his wife, the defendant's wife stated, "This is all

20  part of whatever plan we're headed for, maybe China for the rest of our lives."

21  • **Exhibit No. 12**:  In early 2016, the defendant wrote a letter to his family outlining his

22  desired funeral program.  He also wrote a life sketch about himself that he directed his

23  daughter to read at his funeral.

24      Although the defendant appeared to be joking in some of the calls in which he

25  referenced a plan to fake his own death and disappear using aliases provided by the

26  government, Exhibit 12 demonstrates that the defendant actually planned his funeral in

27  detail.  Moreover, the FBI verified that the Defense Intelligence Agency did provide the

28  defendant with exactly the type of documentation associated with aliases that the

1    defendant described. Furthermore, the comments made by the defendant's wife related to

2    a plan to flee to China for the rest of their lives, as cited in Exhibit 11, confirm that the

3    defendant actually developed such an escape plan and that he actively discussed it with

4    his wife. Finally, his admissions to the CHS confirm an established plan to escape to

5    China should law enforcement discover his criminal activity.

6        This evidence establishes far more than a preponderance that the defendant poses a

7    significant flight risk. If the defendant would flee the country to avoid his financial

8    creditors, the prospect of facing the remainder of his life in federal prison clearly creates

9    an even greater motivation to abscond. Given his access to aliases and his training in

10    intelligence tradecraft, the defendant unquestionably possesses the ability to conceal

11    himself from law enforcement. This ability to conceal himself demonstrates why the

12    revocation of the defendant's passport would not be sufficient to ensure his appearance.

13    In addition, not only does the defendant possess the ability to flee, but his command of

14    the Chinese language, his cultural assimilation in China from his many years of staying

15    there, and the financial support of the PRCIS would also allow the defendant to

16    comfortably maintain himself in a foreign nation with which the United States does not

17    share an extradition treaty.

18                       **OTHER FACTORS**

19        The other relevant considerations confirm that no set of conditions, including the

20    revocation of defendant's passport, will reasonably assure the appearance of defendant in

21    court and ensure the safety of the community and individuals, such as the CHS. The

22    nature of the offense, the weight of the evidence, and the characteristics of the defendant

23    also militate for his continued detention.

24        For time immemorial, espionage ranks as one of the very most serious criminal

25    offenses that an individual can commit, and the case against the defendant relies on

26    overwhelming evidence obtained during a thorough, four-year investigation. Given the

27    sensitivity of information that the defendant possesses from his work as an intelligence

28    officer, including the identity and disposition of sources and agents, intelligence

gathering methods, and the details of operations in which he participated or became aware, the defendant continues to pose a significant risk to safety of individual citizens and the security of the nation as a whole. His continued detention greatly limits his ability to communicate with the PRCIS and thereby minimizes the threat he poses. Although the defendant possesses no prior criminal convictions and proclaims to live a life of piety, the investigation reveals that the defendant's life is an utter façade permeated in nearly every facet with crime and deception.

## CONCLUSION

The statutory factors weigh heavily in favor of detention. In particular, the defendant poses an unusually high risk of flight and possesses sensitive information that makes him a threat to others and the nation as a whole. Additionally, the defendant is charged with an offense that carries a significant penalty. Under these circumstances, the United States urges the court to find that no conditions of release will satisfy those concerns. The United States respectfully requests that the court detain the defendant pending resolution of the case.

DATED this 4th day of June 2018.


/s/ Robert A. Lund
ROBERT A LUND
Assistant United States Attorney

MEMORANDUM IN SUPPORT OF DETENTION- 9

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that he is an employee in the Office of the United States Attorney for the Western District of Washington and is a person of such age and discretion as to be competent to serve papers;

It is further certified that on June 4, 2018, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the CM/ECF participants.


  s/ Thomas Woods
THOMAS WOODS
Assistant United States Attorney
United States Attorney's Office

MEMORANDUM IN SUPPORT OF DETENTION- 10